UNIVERSITY PROPERTIES, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3557–64. Filed January 31, 1966.

*DeWitt Williams*, for the petitioner.
*Walter John Howard, Jr.*, for the respondent.

---

DRENNEN, *Judge:* Respondent determined deficiencies in petitioner's income taxes for its fiscal years ended October 31, 1961 and 1962, in the respective amounts of $40,114.29 and $38,573.53.

The issue for decision is whether payments in the amounts of $80,000 made by petitioner to the board of regents of the University of Washington in each of the taxable years involved, pursuant to a supplemental lease agreement between the board of regents and petitioner dated February 5, 1958, wherein such payments are referred to as "additional rentals," are deductible in full in the year paid, as claimed by petitioner, or must be deducted ratably over the remaining term of the lease, as determined by respondent.

The case was submitted on a stipulation of facts with exhibits attached. A summary of the facts stipulated and pertinent provisions of the stipulated exhibits follows.

Petitioner is a private corporation, incorporated under the laws of Delaware on July 6, 1953. Its principal office is at 210 White-Henry-Stuart Building, Seattle, Wash. It filed U.S. corporation income tax returns for the years here involved with the district director of internal revenue, Tacoma, Wash.

The University of Washington originally occupied a 10-acre site which is now in the heart of downtown Seattle. In the 1890's a 583-acre tract was purchased and this became the new permanent campus of the University of Washington. In 1902 a small parcel of the original campus, located at the southeast corner of Union Street and Third Avenue in the city of Seattle, also being the northwesterly corner of the 10-acre tract, was sold to the Federal Government as a post office site. In 1904 the balance of the 10-acre tract, commonly known and hereafter referred to as the Metropolitan Tract, was leased to James A. Moore for a term of 50 years from November 1, 1904. Three years later the lease was assigned to the Metropolitan Building Co., an organization which undertook to erect buildings and otherwise improve the property. That company constructed the White-Henry-Stuart, Skinner, Stimson, Cobb, and Douglas Buildings, and the Olympic Hotel, including the Metropolitan Theatre, the Olympic Garage, and the Cobb Building Annex. In 1953 the Olympic Hotel and the Metropolitan Theatre, then occupying the entire block on which the Olympic Hotel is situated, were detached from the lease and separately leased to Olympic, Inc.

On July 18, 1953, a lease was executed demising the balance of the Metropolitan Tract to University Properties, Inc., petitioner herein, for a term of 35 years from November 1, 1954. A summary of the principal terms of that lease pertinent to the issue here involved follows.

The term of the lease commenced November 1, 1954, and ends at midnight on October 31, 1989, subject to earlier termination as therein provided. The lessee agreed to pay to the lessor as rent for the demised premises a fixed rent in the amount of $1,600,000 for the lease year commencing November 1, 1954, in the amounts of $1,700,000 for the lease years commencing November 1, 1955 and 1956, and in the amount of $1,800,000 for the lease year commencing November 1, 1957. The lessee further agreed to pay a percentage rental for each lease year commencing November 1, 1958, and continuing to the end of the term of the lease, with a minimum guaranteed rental of $1 million per lease year, determined as a percentage of the gross rental income received by the lessee from subtenants for commercial space and a lesser percentage of the gross rental income received by the lessee from subtenants for office space. The percentage rental is not payable on miscellaneous income of the lessee derived from other sources of business activities, such as resale of public utilities, linen and supply services, janitor services, etc. The lease stated that it was understood that all the rentals provided therein were predicated on the assumption that the entire demised premises would be capable of being occupied, operated, or used by the lessee at all times; and if for any reason other than default of the lessee any portion of the demised premises should not be capable of being occupied, operated, or used by the lessee, the annual minimum guaranteed rental should be reduced for the period of time said space remained untenantable in the amount which would have been the lessor's percentage rental from the untenantable space if said space had been tenantable, and the fixed annual rental should be reduced in a like amount if the situation developed in the first 4 years. The lessee agreed to manage and operate the various buildings on the demised premises as a center of store and office buildings of the first class in the city of Seattle. The lessee also agreed to modernize the buildings on the demised premises and to expend in such modernization at least $2 million, such modernization program to be commenced promptly upon entering into possession of the demised premises and to be completed if reasonably possible on or before November 1, 1958. The lessor agreed to create a "New Building Fund" and to pay a percentage of the gross rental income it received from the demised premises, limited to a certain amount per year, into the fund, which was to be used to reimburse the lessee for the modernization expenditures heretofore mentioned and for the construction of new buildings and major improvements and additions to the property. The lessee agreed to study from time to time the desirability and economic necessity for the construction of new buildings and capital alterations, and to make recommendations to the lessor with reference thereto. The lessor had the right to determine what buildings and

capital improvements would be made, and the lessee was to be responsible for the construction of such buildings and improvements with the right to be reimbursed from the new building fund for the cost thereof. The lessee also agreed to expend not less than 4 percent of its gross rental income from the demised premises for maintenance and repair of the buildings and improvements on the demised premises. The lessor was given the right to cancel the lease upon 12 months' notice if at any time during the term of the lease the lessor should become liable for the payment of Federal income tax on all or any part of its income thereunder and the parties should be unable to arrive at a mutually satisfactory modification of the lease terms compensating for such tax liability, in which event the lessor shall pay to the lessee specified sums for each quarterly rental payment that shall have been made under the lease. Upon termination of the lease the lessee shall surrender the demised premises, together with any of the lessee's improvements, fixtures, and any new buildings and capital alterations which may be constructed upon the demised premises during the term of the lease, in as good condition and repair as when received. Provision was also made for termination of the lease by the lessor in the event of default on the part of the lessee.

On January 29, 1958, the University of Washington reacquired from the U.S. Government a part of the post office site which had been carved out of the original Metropolitan Tract in 1902. As consideration for this land, the University of Washington agreed with the U.S. Government through the General Services Administration to demolish the old post office building and to construct a new post office on that part of the site retained by the Federal Government.

On February 5, 1958, a supplemental lease agreement from the University of Washington to petitioner added this newly acquired property to the properties covered by the 1953 lease, the pertinent terms of which will hereinafter be set forth.

It was decided by the University of Washington and petitioner that the Douglas Building, smallest and least profitable of the Metropolitan Tract buildings, should be demolished and a new and much larger building constructed on the site. The Douglas Building was located on the southwest corner of Fourth Avenue and Union Street, northeast of and adjacent to the original post office tract. Construction of a new building, called the Washington Building, on the site of the smaller Douglas Building and the land acquired by the University of Washington from the Federal Government in 1958, was begun on July 23, 1958, and it was formally opened to occupancy on June 2, 1960. A parking garage for the Washington Building, at the rear of the Washington Building, having access to both Union Street and Third Avenue around the new U.S. Post Office, which was

located at the corner of Union Street and Third Avenue, was constructed to the same height as the new post office building and was designed to blend with the architecture of the new post office and the Washington Building.

A summary of the principal terms of the supplemental lease agreement dated February 5, 1958, between the Board of Regents of the University of Washington and petitioner, pertinent to the issue here involved, follows.

The agreement first referred to the lease of July 18, 1953, and the fact that the parties had determined that in order to accomplish the purposes of that lease and to produce the maximum return for the lessor and to improve the status of the Metropolitan Tract as a business center of the first class, a new building was to be built to replace the present Douglas Building on the present site of the Douglas Building enlarged by the addition of the adjoining tract acquired from the Federal Government. The agreement then provided that the tract of land acquired from the Federal Government, together with any new structures located thereon, shall be deemed to be part of the premises covered by the lease of July 18, 1953, and subject to all the rights and obligations of the parties set forth in said lease, including the right to use moneys in the new building fund with respect to improvements placed on said tract of land. It provided that the lessee should perform and fulfill all of the undertakings and agreements of the lessor arising out of its contract with the General Services Administration to build a new post office, at a cost to the lessor not to exceed the sum of $870,000. The lessee was to be reimbursed out of the new building fund for such costs not exceeding a sum of $870,000, with any excess of such costs to be borne and paid by the lessee. Except as therein modified all the terms, conditions, and provisions of the lease of July 18, 1953, were to continue in full force and effect. The supplemental lease agreement also contained the following provision:

2. Lessee will pay to the Lessor the sum of $80,000.00 on November 1, 1960; the sum of $80,000.00 on November 1, 1961; and the sum of $80,000.00 on November 1, 1962, as additional rentals over and above all rentals provided for under the terms of said lease.

No other reference was made in the supplemental lease agreement to the $80,000 payments called for in the paragraph quoted above.

The payments here involved were recorded in the rental expense account of petitioner's books for the years ending October 31, 1961, and October 31, 1962, in the amount of $80,000 per year. The University of Washington, a tax-exempt organization, recorded these payments as rental income for the years in which received.

Petitioner deducted the $80,000 as rental expense on its returns for each of the years involved. In his notice of deficiency respondent

disallowed the deduction of these amounts on the ground that they "did not represent a current rental payment but a capital expenditure or advance rental not deductible in the year paid," and allowed a deduction for amortization of the amounts paid pro rata over the remaining years of the lease of July 1953.

Petitioner argues that the payments in question should be treated as rentals in accordance with the express agreement of the parties in the supplemental lease agreement and the treatment thereof by both parties on their books and records, and, even if the payments are not properly characterized as rentals, they were ordinary and necessary business expenses deductible as such in the years paid.

We agree with respondent.

Section 162 of the 1954 Code provides:

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

\* \* \* \* \* \* \*

(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

The question of whether the payments were actually rentals is a question of fact to be determined in the light of all the facts and circumstances surrounding them, and the fact that these payments were called additional rentals in the supplemental lease agreement is not controlling. *Southwestern Hotel Co.* v. *United States*, 115 F. 2d 686, 688, certiorari denied 312 U.S. 703; *Oscar L. Thomas*, 31 T.C. 1009, 1012; *Alexander W. Smith, Jr., Executor*, 20 B.T.A. 27. And even if we accept the characterization of these payments in the agreement as rentals, it does not necessarily mean that petitioner can deduct the full amounts thereof in the years paid. It is well settled that advance rentals or the cost of acquiring a leasehold interest is a capital expenditure, recoverable through amortization over the remaining life of the lease. *Main & McKinney Bldg. Co.* v. *Commissioner*, 113 F. 2d 81, affirming a Memorandum Opinion of this Court, certiorari denied 311 U.S. 688; *Baton Coal Co.* v. *Commissioner*, 51 F. 2d 469, affirming 19 B.T.A. 169; *Harry W. Williamson*, 37 T.C. 941; *Lola Cunningham*, 39 T.C. 186; *Southwestern Hotel Co.* v. *United States, supra; Oscar L. Thomas, supra.* Rentals may be deducted as such only for the year or years to which they are applied. If they are paid for the continued use of the property beyond the years in which paid they are not deductible in full in the year paid but must be deducted ratably over the years during which the property is so used. So it makes little difference here whether the payments were paid for the addition of the post office property to the lease, or were addi-

tional rentals for a period extending beyond the years in which paid, or were for something else in the nature of a capital expenditure, *Jos. N. Neel Co.*, 22 T.C. 1083; if they were not paid for the use or possession of the property for the years in which paid, they are not deductible in full in those years as rental. *Main & McKinney Bldg. Co.* v. *Commissioner*, *supra; Baton Coal Co.* v. *Commissioner*, *supra.*

The supplemental lease agreement makes no explanation of why the "additional rentals" were to be paid. Petitioner would receive no income from the use of the property added to the original lease during the years here involved, at least until the Washington Building was completed and rented. The parties had agreed that the Douglas Building was to be demolished and that it was necessary to add the additional property to the site on which the Douglas Building was located to build a new, larger, and more profitable building. Under the terms of the original lease, if any of the demised buildings were to become untenantable during the terms of the lease, the rental paid by petitioner to the lessor was to be reduced while such condition prevailed. It would seem logical that instead of paying additional rent for these 3 years, petitioner's rent expense would have been reduced while the property was nonincome producing, rather than increased. Of course this would have been the situation while the Douglas Building was being demolished and the Washington Building was being built, except for the payments here involved.

We do not think it is reasonable, likely, or a fact that petitioner would pay $80,000 per year additional rental for the leased property during the years here involved, when the property would produce less rental income to petitioner than before, unless it was for the purpose of making it possible for petitioner to have included in its lease a new and larger building from which it could collect income over the remaining life of the lease. We are convinced from the agreed upon evidence before us that the payments were consideration, directly or indirectly, for the continued use of the additional property and the improvements to be placed thereon over the life of the lease and were not rentals applicable only to the years in which paid.[1] This does not constitute a revision of the agreement as written and executed by the parties but simply an interpretation thereof as written, in the light

---

[1] We feel certain that some logical explanation of why these payments were called for in the agreement could have been given us but the parties offered no testimony from any of the interested parties to explain it. Respondent offered as exhibits three reports from the Board of Regents of the University of Washington to the State legislature, and a copy of a letter dated Sept. 13, 1957, from officers of petitioner to the board of regents, to explain why these payments were made, but petitioner objected to the admission of these documents in evidence on the grounds, among others, of incompetency. We think documentary evidence of this nature, attempting to explain the meaning of a written agreement, even if admissible, would have very little probative value, and certainly would not be the best evidence available to explain this provision in the agreement which is the focal point of the argument between the parties. In any event we have not considered these exhibits in reaching our decision and it is not necessary for us to rule on their admissibility.

of the surrounding facts and circumstances. The fact that during the first 4 years of the original lease petitioner paid a fixed rental has no controlling bearing on the underlying reason for these payments.

Petitioner also argues that even if these payments are not deductible as rent, they are deductible as ordinary and necessary business expenses of petitioner; that when the acquisition of even a capital asset is incidental to the ordinary operation of a taxpayer's business, the expenditure therefor will be treated as an ordinary and necessary business expense, deductible in full. Petitioner relies primarily on cases such as *Commissioner* v. *Bagley & Sewall Co.*, 221 F. 2d 944; *Booth Newspapers, Inc.* v. *United States*, 303 F. 2d 916; and *John J. Grier Co.* v. *United States*, 328 F. 2d 163. Those cases involved the deductibility as business expenses of losses suffered by taxpayers on the sale of stock or securities they had been obligated to purchase in connection with their everyday business operations. Those cases are not controlling here because we are not concerned with losses, and, furthermore, we have no evidence that petitioner was required to make these $80,000 payments in connection with the everyday operation of its business. There is nothing in the original lease that would require petitioner to pay "additional rentals" in order to keep up or increase the value of the demised premises to produce additional income for both the lessor and itself. This would be taken care of by the percentage rental provisions. The most that can be said is that petitioner was perhaps required to make these payments so it could benefit from the use of the increased and improved property in the future. But as said by the Board of Tax Appeals in *Baton Coal Co.*, 19 B.T.A. 169, 171:

Where expenditures are in part a consideration for the use of rented premises for years other than the taxable years, the whole thereof can not properly be considered ordinary and necessary expenses of carrying on the business during the taxable years, and only the part thereof properly attributable to the process of earning income during the taxable years may be deducted from gross income for those years. * * *

Petitioner relies on *Wyoming National Bank of Casper, Wyoming*, 23 B.T.A. 408, wherein a bank was allowed to deduct in the years paid two payments of $10,000, in addition to the rental provided in the lease, in order to permit the lessor to speed up construction of the building and make certain structural changes requested by the taxpayer. The evidence was that the bank was located in a booming city and it was losing customers by not being able to move into its new quarters, and that the lessor was either unwilling or unable to pay for the speedup in construction. Here we have no evidence that would bring petitioner's situation within the ambit of that case.

We conclude that respondent did not err in determining that the $80,000 payments were not fully deductible in the years involved.

*Decision will be entered for the respondent.*